**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **MINER, LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.  5:22-CV-00526** |
| | § | |
| **THOMAS SAWYER, BOB FLECKEN** | § | **JURY TRIAL DEMANDED** |
| **and WESTCOAST GATE & ENTRY** | § | |
| **SYSTEMS, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

<u>**PLAINTIFF MINER, LTD.'S VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF**</u>
<u>**AND DAMAGES AND DEMAND FOR JURY TRIAL**</u>

Plaintiff MINER, LTD. ("Miner" or the "Company") hereby files this Complaint for Injunctive Relief and Damages against Defendants THOMAS SAWYER, BOB FLECKEN and WESTCOAST GATE & ENTRY SYSTEMS, LLC (collectively, the "Defendants") and shows the Court as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      This case involves two former long-time, high-level executives of Miner, Defendant Thomas Sawyer ("Sawyer") and Defendant Bob Flecken ("Flecken"), who are in breach of their restrictive covenants with Miner, and are currently employed by Miner's direct competitor, Defendant Westcoast Gate & Entry Systems, LLC ("Westcoast").

2.      Defendant Flecken was most recently Miner's Southwest Regional Vice President, and is in breach of the restrictive covenants detailed in his two Profits Interests Unit Grant Agreements with Miner through his current employment with Westcoast as its Chief Executive Officer.  Not only did Defendant Flecken breach his agreement not to compete with Miner after the end of his employment with Miner, but in his new position as CEO of Westcoast, Defendant Flecken conspired with Westcoast to continue to leverage, and draw upon Defendant Flecken's

010-9359-5190/11

prior employment with Miner, and unlawfully interfere with Miner's business relationships by inducing and ultimately hiring Defendant Sawyer to work for Westcoast, and also use Miner's confidential, proprietary and trade secret information to improperly compete against Miner and cause Miner irreparable harm.

3.    Defendant Sawyer was most recently Miner's Senior Vice President of Operations and Customer Care, and is in breach of the restrictive covenants in his Profits Interests Unit Grant Agreement and Non-Competition, Non-Solicitation and Confidentiality Agreement with Miner through his current employment with Westcoast as its new Chief Operating Officer. Through his employment with Westcoast, Defendant Sawyer is in direct violation of his agreement not to compete with Miner after the end of his employment with Miner, and is using Miner's confidential, proprietary and trade secret information to improperly compete against Miner and cause Miner irreparable harm.

4.    Defendant Flecken and Defendant Sawyer obtained, and have now conspired with their new employer, Defendant Westcoast, to actively use Miner's confidential, proprietary and trade secret information to improperly compete against Miner, causing Miner irreparable harm.

5.    With knowledge of the restrictive covenants in Defendant Sawyer and Defendant Flecken's agreements with Miner, Defendant Westcoast continues to employ both individuals— thus tortiously interfering with Miner's contractual relationships.

6.    This is an action to prohibit the continued contractual breaches of Defendants Sawyer and Flecken and put an end to the Defendants illegal violations of state and federal law.

7.    Miner seeks all relief available to it under the law, including damages, and equitable relief prohibiting Defendants Sawyer, Flecken and their new employer, Westcoast, from

2

unlawfully and unfairly competing against Miner.

## PARTIES

8.     Plaintiff Miner is a national industry leader in the sale, design, management, installation, repair and maintenance of gates, commercial doors, existing door replacement, equipment installation, loading dock sales and repairs, loading dock services, and commercial building asset management solutions.

9.     Miner, through its website, www.minercorp.com, markets itself as "North America's facility expert" that provides top-tier support to Fortune 500-class companies and improves commercial warehouse facility management services and jobsite safety through industry-leading project management, installation services, loading dock repairs, commercial door repairs, steel door installations, commercial gate repairs and installations, overhead door services and other commercial building management solutions.

10.     Miner is a limited partnership organized under the laws of the State of Texas, with its principal place of business at 11827 Tech Com Dr. #115 San Antonio, TX 78233.

11.     Defendant Flecken is a former high-level executive of Miner who was associated with Miner for over 7 years.

12.     Upon information and belief, Defendant Flecken resides at 6282 Reubens Drive, Huntington Beach, California 92647.

13.     Defendant Flecken contracted with Miner, a Texas company, and the allegations in this action stem from his breach of his contracts with Miner. Additionally, Defendant Flecken tortiously interfered with Defendant Sawyer's contracts with Miner by recruiting, soliciting and hiring Defendant Sawyer to work for Defendant Westcoast.

3

14.     Defendant Sawyer is a former high-level executive of Miner who was associated with Miner for over 10 years.

15.     Upon information and belief, Defendant Sawyer resides at 2105 North Kachina, Mesa, Arizona 85203.

16.     Sawyer contracted with Miner, a Texas company, and the allegations in this action stem from his breach of his contracts with Miner.

17.     Defendant Westcoast is Miner's competitor in the commercial gate installation, automation, construction, and repair industry.

18.     In direct competition with Miner, Westcoast markets itself on its website, www.westcoastgate.com, as a company performing commercial gate installation, automation and repair.

19.     Defendant Westcoast is a company organized under the laws of the State of California with its principal place of business located at 339 Isis Avenue, Inglewood, California 90301.

20.     As set forth herein, Defendant Westcoast recruited Defendant Flecken for employment and tortiously interfered with Defendant Flecken's contracts with Miner.

21.     Additionally, Defendant Westcoast and Defendant Flecken recruited Defendant Sawyer for employment at Westcoast and tortiously interfered with Defendant Sawyer's contracts with Miner.

## JURISDICTION AND VENUE

22.     Pursuant to 28 U.S.C. §§ 1331 and 1367(a), this Court has subject matter jurisdiction over this action because this case arises under the Defend Trade Secrets Act, 18

4

U.S.C. § 1836, *et. seq.* and otherwise includes claims so related as to form part of the same case or controversy.

23.     Pursuant to 28 U.S.C. § 1391(b)(2), this Court is the proper venue for this matter, as a substantial part of the events giving rise to this action took place in the Western District of Texas.

## FACTS

*Miner's Protection of Its Confidential, Proprietary, and Trade Secret Materials*

24.     In the highly competitive industry in which Miner operates, its confidential, proprietary, and trade secret information is critical to maintaining Miner's competitive position. Accordingly, Miner takes a number of steps to protect the confidentiality of its information.  Such steps include: (1) requiring the execution of non-compete, non-solicitation, and nondisclosure restrictive covenants; (2) instructing employees to avoid conflicts of interest; (3) marking many of Miner's most confidential documents with a "confidential" or similar legend; (4) conducting on-the-job security training and utilizing occupational security best practices; (5) implementing electronic security measures, such as use of passwords, security time-outs on computers, and segregation of confidential information; and (6) employing physical security measures, such as placing locks on offices, doors, and file cabinets.

25.     Miner's Employee Handbook also contains a Confidential Information policy which states:

> **All Company records, such as customer lists, pricing information, payroll records, personnel information, trade secrets and other proprietary information are to be treated with utmost confidence.** Unauthorized release of such information is grounds for immediate dismissal. **Any records, procedures and information concerning the**

**Miner Companies developed by you while in the employment of the Company remain the property of the Miner Companies when you leave the Company. Do not discuss Company business with anyone who does not work for us.** If someone approaches you about Company information, refer them immediately to your supervisor. All employees are required to read, sign and to comply with the terms of the non-disclosure and non-competition agreement, as revised or amended, at the time of their employment.

*See* **Exhibit A at p. 5,** Relevant Excerpts of the Miner Corporation Employee Handbook, Section VI, Confidential Information (emphasis added).

26.     The Employee Handbook also maintains Miner's policies governing the use of electronic information and systems. These policies prohibit the use of Miner's computer systems and e-mail system for any purpose not connected to Miner's business and objectives. *See id.* **at p. 7-8,** Relevant Excerpts of Miner Corporation Employee Handbook, Section VII, Electronic Information.

27.     Specifically, Miner's Electronic Information Policy states in relevant part:

**In order to protect the security of its computer, networks, e-mail, voice mail, phone systems, Internet access and other methods of communication or storage information, Miner has established certain security procedures listed below that all employees using such systems are required to follow.  Failure to comply with the security procedures established by the Company, or the willful misuse of Miner communication and information systems, will result in disciplinary action that may include termination of employment and possible criminal action.**

**. . .**

**Furthermore, employees may not remove copy or otherwise transfer data from Miner computers without prior permission from the Management Information Systems Director or representative.**

**. . .**

010-9359-5190/11

> **Further, the computers at Miner, including the e-mail system, should only be used in connection with Miner's business and objectives . . . .**

*See id.* **at p. 7-8**, Relevant Excerpts of Miner Corporation Employee Handbook, Section VII, Electronic Information (emphasis added).

28.     The Employee Handbook also counseled employees on avoidance of conflicts of interests.  *See id.* **at p. 6,** Relevant Excerpts of Miner Corporation Employee Handbook, Outside Employment.

29.     During their employment with Miner, Defendant Sawyer and Defendant Flecken were given access to and subjected to the policies set forth in the Miner Handbook.

### *Defendant Flecken's Employment with Miner*

30.     Miner hired Defendant Flecken as a Director of Service Sales and Marketing in April 2010 in its San Antonio, Texas office.

31.     As a Director of Service Sales and Marketing, Defendant Flecken was responsible for implementing Miner's market share expansion efforts across Miner's Texas and Florida markets.

32.     Defendant Flecken routinely had material and substantial contact with Miner's customers and supervised a substantial number of Miner employees.

33.     Defendant Flecken developed and assisted Miner in developing and maintaining long-standing customer relationships and customer goodwill throughout Miner's footprint, and understood how to best position Miner to excel within the industry.

34.     In January of 2011, Defendant Flecken was promoted to Vice President of Service at Miner.

35.     As Vice President of Service, Defendant Flecken gained more responsibility and was granted access to more of Miner's confidential, proprietary and trade secret information.

36.     As Miner's Vice President of Service, Defendant Flecken was responsible for and oversaw Miner's organic and merger and acquisition growth across Miner's service operations, was responsible for the growth and development of Service Management and Customer Care Teams, and oversaw the expansion of Miner's global footprint and market share.

37.     As Vice President of Service, Defendant Flecken even had access to Miner's confidential global profit and loss statement that only certain, high-level ranking executives had access to.

38.     In June of 2014, Defendant Flecken received another promotion at Miner when he was promoted to Territory Vice President for Miner Southwest—a division of Miner.

39.     As Territory Vice President, Defendant Flecken once again gained additional responsibility and had further insight into Miner's confidential, proprietary and trade secret information.

40.     As the Territory Vice President for Miner Southwest, Defendant Flecken's list of responsibilities continued to grow as he managed people development, technical support, sales support, new market expansion, and integration and development for Miner Southwest. Defendant Flecken was also responsible for the growth and day to day operations for Miner's Service Centers.

41.     In or around July or August 2015, Defendant Flecken was promoted to Regional Vice President with Miner.

42.     As Regional Vice President, Defendant Flecken gained additional management-level responsibility and further insight into Miner's confidential, proprietary and trade secret

8

information.

43.     As Miner's Regional Vice President, Defendant Flecken oversaw Miner's Western United States operations, was responsible for ensuring this region met its sales goals, managing the territory, developing target prospects, leading marketing campaigns, and communicating with other high-level Miner executives across the country to execute Miner's market share expansion efforts.

44.     Defendant Flecken remained Miner's Regional Vice President, the highest position he reached at Miner, until he resigned from Miner.

45.     Throughout his employment with Miner, to best assist Miner's customers, Defendant Flecken had access to and did access Miner's confidential, proprietary and trade secret information, including, but not limited to, highly valuable "know how," financial information, trade secrets, pricing policies, pricing discounts, operational methods, marketing plans and/or strategies, product development techniques or plans, designs, design projects, growth projections, business strategy plans, and had key insight into Miner's business, strategy, and growth plans for the future.

46.     Consistent with Miner's business practice of securing its confidential, proprietary, and trade secret information, Miner required that Defendant Flecken execute a Profits Interests Unit Grant Agreement whereby Defendant Flecken agreed not to compete with Miner and not to solicit Miner's employees.

47.     At all times during his employment with Miner, Defendant Flecken was also subject to the policies in Miner's Employee Handbook in place to protect its proprietary, confidential and trade secret information.

### *Defendant Flecken's March 2017 Profits Interests Unit Grant Agreements' Restrictive Covenants*

48.   On or about March 10, 2017, Defendant Flecken garnered the opportunity to participate in the Company's stock option plan to obtain Preferred and Common stock during his employment with Miner.

49.   In connection with that opportunity, and recognizing that Defendant Flecken was continuing to gain growing access to Miner's substantial confidential, proprietary and trade secret information during his employment with Miner, Miner had Defendant Flecken execute two (2) separate Profits Interests Unit Grant Agreements on March 10, 2017, each of which included restrictive covenants. Copies of Defendant Flecken's Profits Interests Unit Grant Agreements Annexes and Addendum are attached hereto collectively as **Exhibit B**.

50.   One of the Agreements granted Defendant Flecken Common and Preferred Stock as rollover equity from Defendant Flecken's prior capital investment.  *See id*. **at p. 2-7,** Flecken's Profits Interests Unit Grant Agreements Annex.

51.   The other Agreement granted Defendant Flecken Common Stock. *See id*. **at p. 8-22,** Flecken's Profits Interests Unit Grant Agreements Annex and Addendum.

52.   Each Agreement contained separate, but identical, restrictive covenant provisions. *See generally* **Exhibit B,** Flecken's Profits Interests Unit Grant Agreements Annexes and Addendum.

53.    Pursuant to the Non-Competition provisions in the Profits Interests Unit Grant Agreements, Defendant Flecken agreed, among other items, to refrain from performing services for any competing company for a period of thirty-six (36) months (the "**Restricted Period**") after

he ceased to hold any of the Profits Interests Units awarded under the terms of the Profits Interests Unit Grant Agreements. *See id.* **at p. 3-4, 12-13,** Flecken's Profits Interests Unit Grant Agreements Annexes, Restrictive Covenants, Non-Competition and Non-Solicitation (i).

54.    Specifically, Defendant Flecken's Profits Interests Unit Grant Agreements' Non-Competition provisions state:

> **For so long as [Rollover Member or Management Member] holds any Units and for the thirty-six (36) month period after [Rollover Member or Management Member] ceases to hold any Units (the "**Restricted Period**"), [Rollover Member or Management Member] shall not, directly or indirectly, either for himself/herself or for any other Person, consult or advise for, provide services to, engage in (including sales and marketing for), own, operate, manage, control, participate in, be employed by or permit his name to be used by, any firm, company, business, entity or Person whose primary purpose is the operation of any business that competes with the Business (as defined below) (or any division or unit thereof), Company and/or any of its Subsidiaries (a "**Competing Business**") (whether for pay or no pay)** in a Restricted Territory (as defined below). For purposes of this Agreement, the term "participate" includes any direct or indirect interest in any Competing Business, whether as a stockholder, partner, joint venturer, franchisor or otherwise (other than by ownership of less than five percent (5%) of a company whose securities are registered under the Securities Exchange Act of 1934, as amended, and listed on any national security exchange, so long as [Rollover Member or Management Member] has no active participation in the business of such company), or rendering any direct or indirect service or assistance to any Competing Business. For purposes of this Annex A, "Restricted Territory" shall mean anywhere in North America or any other geographic location in which the Company and its Subsidiaries engage in the Business or have taken active steps toward engaging in the Business on the date hereof. For purposes of this Annex A, "Business" shall mean the business of providing repair service, planned maintenance support, leasing and lease structuring, sales and installation, equipment modernization, diagnostics and analytics services for truck loading dock equipment, commercial doors, recycling/waste handling equipment, material handling equipment, security and access controls solutions, storefront glass systems to customers, and similar equipment and fixtures located at retail, distribution, manufacturing, healthcare and hospitality companies or providing material handling equipment and fleet management and

11

maintenance services, or in any other business activity directly related to the business in which the Company, through its Subsidiaries, is now, or contemplates to be, involved.

*Id.* **at p. 3-4, 12-13,** Flecken's Profits Interests Unit Grant Agreements Annexes, Restrictive Covenants, Non-Competition and Non-Solicitation (i) (emphasis added).

55. Pursuant to the Non-Solicitation provision in the Profits Interests Unit Grant Agreements, Defendant Flecken agreed, among other items, not to solicit or hire Miner employees during the **Restricted Period**. *See id.* **at p. 4-5, 13-14,** Flecken's Profits Interests Unit Grant Agreements Annexes, Restrictive Covenants, Non-Competition and Non-Solicitation (ii) (emphasis added).

56. Specifically, Defendant Flecken's Profits Interests Unit Grant Agreements' Non-Solicitation of employees provisions state:

> **During the Restricted Period, without the written consent of the Company, [Rollover Member or Management Member] shall not, directly or indirectly (A) engage, recruit or solicit for employment or engagement, offer employment to, hire,** or enter into any independent contractor relationship with, **any employee or independent contractor of any of the Company, its Subsidiaries or any of their Affiliates (each, a "Restricted Person"); (B) otherwise induce, or attempt to induce (or assist any other Person in engaging in any such activities), any Restricted Person to leave the employ of the Company, its Subsidiaries or any of their Affiliates, or to accept employment with another Person, (C) in any way interfere with the relationship between the Company, its Subsidiaries or any of their Affiliates, on the one hand, and any Restricted Person, on the other hand, or (D) hire any Restricted Person,** <u>provided</u>, that that nothing in this clause (ii) shall prohibit [Rollover Member or Management Member] from engaging in any general advertising (including but not limited to, advertising in newspapers of general circulation) or general solicitation (including, but not limited to, through recruitment or search agencies or on the internet) not specifically targeted to such Restricted Persons. So as to avoid any disputes under the Restrictive Covenants, it shall be conclusively presumed by the parties that

12

any such hiring contemplated by clauses (A) and (D) above, during the Restricted Period, will be in violation of this paragraph.

*Id*. **at p. 4-5, 13-14**, Flecken's Profits Interests Unit Grant Agreements Annexes, Restrictive Covenants, Non-Competition and Non-Solicitation (ii) (emphasis added).

57.     Defendant Flecken remains in the **Restricted Period** as defined in the Profits Interests Unit Grant Agreements as he still holds his capital investment in Miner.

### *Defendant Flecken Breaches his Profits Interests Unit Grant Agreements*

58.     Despite the restrictive covenants in his Profits Interests Unit Grant Agreements, Defendant Flecken resigned from his employment with Miner in November 2017, just eight months after the execution his Profits Interests Unit Grant Agreements, and began working for Miner's competitor Westcoast as its Chief Executive Officer in violation of his agreement not to compete against Miner.

59.     In his new role at Westcoast, Defendant Flecken uses Miner's proprietary information to directly compete against Miner in furtherance of Westcoast's business purposes.

60.     Additionally, Defendant Flecken committed another violation of his restrictive covenants with Miner by inducing Defendant Sawyer, another long-time, high-level, Miner management executive to leave his employment with Miner, and begin employment with Westcoast.

61.     Defendant Flecken and Defendant Sawyer were longtime colleagues at Miner.

62.     Defendant Flecken and Defendant Sawyer have a longstanding relationship and friendship dating back to when they both worked for Vortex Industries prior to joining Miner.

63.     Defendant Flecken even hired Defendant Sawyer at Miner.

13

*Defendant Sawyer's Employment with Miner*

64.     Specifically, Miner first hired Defendant Sawyer as a Director of Operations in January 2011 in its Tempe, Arizona office.

65.     As a Director of Operations, Defendant Sawyer routinely supervised a substantial number of Miner employees and had access to Miner's confidential, proprietary and trade secret information.

66.     In July of 2015, Defendant Sawyer was promoted to Regional Vice President of Miner, and was named the Regional Vice President for Miner Southwest, a division of Miner, in November of 2017 after Defendant Flecken's departure.

67.     As Regional Vice President for Miner Southwest, Defendant Sawyer gained more responsibility and was granted access to more of Miner's confidential, proprietary and trade secret information.

68.     As Regional Vice President for Miner Southwest, Defendant Sawyer's lists of responsibilities continued to grow as he managed people development, technical support, sales support, new market expansion, integration and development for Miner Southwest. He was also accountable for the growth and day to day operations for Miner's Service Centers.

69.     In order to best service Miner's clients, Defendant Sawyer had access to and did access Miner's confidential, proprietary and trade secret information, including highly valuable "know how," including, but not limited to, financial information, trade secrets, pricing policies, pricing discounts, operational methods, marketing plans and/or strategies, product development techniques or plans, designs, design projects, growth projections, business strategy plans, and had key insight into Miner's business, strategy, and growth plans for the future.

14

70.     Consistent with Miner's business practice of securing its confidential, proprietary, and trade secret information, Miner required that Defendant Sawyer execute a Non-Competition, Non-Solicitation and Confidentiality Agreement whereby Defendant Sawyer agreed not to compete against Miner, and not to reveal any of Miner's confidential, proprietary, trade secret information.

71.     At all times during his employment with Miner, Defendant Sawyer was also subject to the policies in Miner's Employee Handbook in place to protect its proprietary, confidential and trade secret information.

### *Defendant Sawyer's November 2017 Non-Competition, Non-Solicitation and Confidentiality Agreement*

72.     In connection with Defendant Sawyer's November 2017 promotion to Regional Vice President for Miner Southwest, on November 1, 2017, Miner required that Defendant Sawyer execute a Non-Competition, Non-Solicitation and Confidentiality Agreement. *See* **Exhibit C**, Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement.

73.     Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement, contains, among other items, a non-compete restrictive covenant and a confidentiality provision. *See id*. **at p. 2-3**, Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement, Sections 2(a) and (d).

74.     Pursuant to the Non-Competition, Non-Solicitation and Confidentiality Agreement, Defendant Sawyer agreed to refrain from competing against Miner for a period of three years following the end of his employment relationship with Miner.  *See id*. **at p. 2**, Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement, Section 2(a).

75.     Specifically, Defendant Sawyer's Non-Compete provision of the Non-Competition, Non-Solicitation and Confidentiality Agreement with Miner states in relevant part:

> (a)     <u>Non-Compete</u>. Employee acknowledges that by virtue of his or her respective position with the Company, he or she has developed considerable expertise in the business of the Company. **During the Employee's employment with the Company and for a period of three (3) years following the date of the Employee's termination of employment for any reason (the "Non-Competition Period"), the Employee shall not, without the prior written consent of the Company, and whether as employee, principal, agent, shareholder, partner, consultant, advisor, limited liability company manager or member, director, or otherwise, directly or indirectly, compete anywhere in North America or any other geographic location in which the Company engages in business or has taken active steps towards engaging in business as of the date of Employee's termination of employment,** with the Company or any Affiliate (as defined herein) of the Company in the business of providing repair service, planned maintenance support, sales and installation, equipment modernization, diagnostics and analytics services for truck loading dock equipment, commercial doors, recycling/waste handling equipment, material handling equipment, security and access control solutions, storefront glass systems to customers, and similar equipment and fixtures located at retail, distribution, manufacturing, healthcare and hospitality companies or providing material handling equipment, and fleet management and maintenance services, as conducted by the Company or any Affiliate of the Company, or in any other business activity directly related to the business in which the Company is now involved or becomes involved during the term of Employee's employment (the "Business"), **nor will Employee engage in any other activities that conflict with his or her obligations to the Company….**

*Id.* **at p. 2**, Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement, Section 2(a) (emphasis added).

76.     Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement's Confidentiality provision states:

> (d)     <u>Confidentiality.</u> **Employee shall, in perpetuity, maintain in confidence and shall not directly, indirectly or otherwise, use, disseminate, disclose or publish, or use for his or her benefit or the**

16

**benefit of any person, firm, corporation or other entity any confidential or proprietary information or trade secrets of or relating to the Company**, including, without limitation, information with respect to the Company's operations, processes, products, inventions, business practices, finances, principals, vendors, suppliers, customers, potential customers, marketing methods, costs, prices, contractual relationships, regulatory status, compensation paid to employees or other terms of employment, or deliver to any person, firm, corporation or other entity any document, record, notebook, computer program or similar repository of or containing any such confidential or proprietary information or trade secrets. Employee shall not be considered to violate this confidentiality covenant as a result of information required to be provided to current or potential customers, suppliers or other third parties strictly in the ordinary course of business. **The parties hereby stipulate and agree that as between them the foregoing matters are important, material and confidential proprietary information and trade secrets and affect the successful conduct of the business of the Company (and any successor or assignee of the Company).**

*Id.* **at p. 3**, Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement, Section 2(d) (emphasis added).

77.     Defendant Sawyer agreed that the **Non-Competition Period** outlined above "shall be tolled during (and shall be deemed automatically extended by) any period in which Employee is in violation of the provisions of [these Non-Compete and Non-Solicitation of Employees and Customers restrictive covenants]." *See id.* **at p. 3**, Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement, Section 2(c).

78.     Defendant Sawyer further agreed in his Non-Competition, Non-Solicitation and Confidentiality Agreement that a breach of any of the covenants in his Non-Competition, Non-Solicitation and Confidentiality Agreement with Miner "will cause irreparable damage to the Company and its goodwill, the exact amount of which will be difficult or impossible to ascertain, and that the remedies at law for any such breach will be inadequate." Thus, in the event of a breach

17

and in addition to any other remedy available to the Company at law or in equity, "the Company will be entitled to specific performance and injunctive relief." *See **id*. at p. 3**, Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement, Section 3.

### *Defendant Sawyer's May 2018 Profits Interests Unit Grant Agreement's Restrictive Covenants*

79.     In addition to the Non-Competition, Non-Solicitation and Confidentiality Agreement, **Exhibit C**, Defendant Sawyer garnered the opportunity to participate in the Company's stock option plan during his employment with Miner. In connection with that opportunity and to further protect Miner's proprietary, confidential and trade secret information, Miner required that Defendant Sawyer execute a Profits Interests Unit Grant Agreement on or about May 1, 2018, which included restrictive covenants. *See* **Exhibit D**, Defendant Sawyer's Profits Interests Unit Grant Agreement, Annex A.

80.     Pursuant to the Non-Competition and Non-Solicitation provisions in Defendant Sawyer's Profits Interests Unit Grant Agreement, Defendant Sawyer agreed, among other items, to refrain from performing services for any competing company for a period of thirty-six (36) months after he ceased to hold any of the Profits Interests Units awarded under the terms of the Profits Interests Unit Grant Agreement. *See **id*. at p. 7,** Defendant Sawyer's Profits Interests Unit Grant Agreement, Annex A, Restrictive Covenants, Non-Competition and Non-Solicitation (i).

81.     Specifically, the Profits Interests Unit Grant Agreement's Non-Competition provision states:

> **For so long as Management Member holds any Units and for the thirty-six (36) month period after Management Member ceases to hold any Units (the "Restricted Period"), Management Member shall not, directly or indirectly, either for himself/herself or for any other Person,**

18

**consult or advise for, provide services to, engage in (including sales and marketing for), own, operate, manage, control, participate in, be employed by or permit his name to be used by, any firm, company, business, entity or Person whose primary purpose is the operation of any business that competes with the Business (as defined below) (or any division or unit thereof), Company and/or any of its Subsidiaries (a "Competing Business") (whether for pay or no pay)** in a Restricted Territory (as defined below). For purposes of this Agreement, the term "participate" includes any direct or indirect interest in any Competing Business, whether as a stockholder, partner, joint venturer, franchisor or otherwise (other than by ownership of less than five percent (5%) of a company whose securities are registered under the Securities Exchange Act of 1934, as amended, and listed on any national security exchange, so long as Management Member has no active participation in the business of such company), or rendering any direct or indirect service or assistance to any Competing Business. For purposes of this Annex A, "Restricted Territory" shall mean anywhere in North America or any other geographic location in which the Company and its Subsidiaries engage in the Business or have taken active steps toward engaging in the Business on the date hereof. For purposes of this Annex A, "Business" shall mean the business of providing repair service, planned maintenance support, leasing and  lease structuring, sales and installation, equipment modernization, diagnostics and analytics services for truck loading dock equipment, commercial doors, recycling/waste handling equipment, material handling equipment, security and access controls solutions, storefront glass systems to customers, and similar equipment and fixtures located at retail, distribution, manufacturing, healthcare and hospitality companies or providing material handling equipment and fleet management and maintenance services, or in any other business activity directly related to the business in which the Company, through its Subsidiaries, is now, or contemplates to be, involved.

*Id*. **at p. 7,** Defendant Sawyer's Profits Interests Unit Grant Agreement, Annex A, Restrictive Covenants, Non-Competition and Non-Solicitation (i) (emphasis added).

82.    Pursuant to the Non-Solicitation provision in his Profits Interests Unit Grant Agreement, Defendant Sawyer agreed, among other items, not to solicit or hire Miner employees during the Restricted Period. *See id*. **at p. 8**, Defendant Sawyer's Profits Interests Unit Grant Agreement, Annex A, Restrictive Covenants, Non-Competition and Non-Solicitation (ii).

19

83.     Specifically, Defendant Sawyer's Profits Interests Unit Grant Agreement's Non-Solicitation of employees provision state:

> **During the Restricted Period, without the written consent of the Company, Management Member shall not, directly or indirectly (A) engage, recruit or solicit for employment or engagement, offer employment to, hire, or enter into any independent contractor relationship with, any employee or independent contractor of any of the Company, its Subsidiaries or any of their Affiliates (each, a "Restricted Person"); (B) otherwise induce, or attempt to induce (or assist any other Person in engaging in any such activities), any Restricted Person to leave the employ of the Company, its Subsidiaries or any of their Affiliates, or to accept employment with another Person, (C) in any way interfere with the relationship between the Company, its Subsidiaries or any of their Affiliates, on the one hand, and any Restricted Person, on the other hand, or (D) hire any Restricted Person,** provided, that that nothing in this clause (ii) shall prohibit Management Member from engaging in any general advertising (including but not limited to, advertising in newspapers of general circulation) or general solicitation (including, but not limited to, through recruitment or search agencies or on the internet) not specifically targeted to such Restricted Persons. So as to avoid any disputes under the Restrictive Covenants, it shall be conclusively presumed by the parties that any such hiring contemplated by clauses (A) and (D) above, during the Restricted Period, will be in violation of this paragraph.

*Id.* **at p. 8**, Defendant Sawyer's Profits Interests Unit Grant Agreement, Annex A, Restrictive Covenants, Non-Competition and Non-Solicitation (ii) (emphasis added).

### *Defendant Sawyer's Promotions to National Vice President, Sales, and Senior Vice President of Operations and Customer Care*

84.     Following his November 2017 promotion, Defendant Sawyer continued to ascend up the management ranks at Miner and was named the National Vice President, Sales in August of 2020. A true and correct copy of the Defendant Sawyer's August 26, 2020 Letter Agreement and the accompanying Exhibit A are collectively attached hereto as **Exhibit E**.

85.     As National Vice President, Sales, Defendant Sawyer remained subject to the terms

20

of his 2017 Non-Competition, Non-Solicitation and Confidentiality Agreement and 2018 Profits Interests Unit Grant Agreement and gained additional access to Miner's confidential, proprietary and trade secret information.

86.    After serving as the National Vice President, Sales for approximately a year, Defendant Sawyer was promoted to Senior Vice President of Operations and Customer Care in August of 2021.

87.    As the Senior Vice President of Operations and Customer Care, Defendant Sawyer continued to have ongoing and unfettered access to Miner's confidential, proprietary and trade secret information.

88.    Through his customer contact, Defendant Sawyer developed and assisted Miner in developing and maintaining long-standing customer relationships and customer goodwill and understood how to best position Miner to excel within the industry.

### *Defendants Westcoast and Flecken Conspire to Induce Defendant Sawyer to Breach his Restrictive Covenants with Miner*

89.    Defendant Sawyer remained as Miner's Senior Vice President of Operations and Customer Care until he was unlawfully induced to leave the Company by Defendants Flecken and Westcoast.

90.    Defendants Flecken and Westcoast enticed Defendant Sawyer to leave Miner by granting him an opportunity to leave his role at Miner as a Senior Vice President of Operations and Customer Care, notwithstanding his restrictive covenant agreements, and join Westcoast as one of its top executives—its Chief Operating Officer.

91.    Defendants Flecken and Westcoast induced Defendant Sawyer to leave Miner even

21

though they knew that Defendant Sawyer was subject to restrictive covenants with Miner as Defendant Flecken entered into similar restrictive covenants during his employment with Miner.

### *Defendant Sawyer Breaches his Restrictive Covenants with Miner*

92.     Defendant Flecken jumped at this opportunity, and within weeks of resigning from Miner on February 3, 2022, joined Defendants Flecken and Westcoast as Westcoast's Chief Operating Officer in late February 2022.

93.     However, given his February 3, 2022 resignation date, Defendant Sawyer's 3-year Non-Competition Period does not expire until February 3, 2025 at the earliest, and is tolled given his ongoing breach of the restrictive covenants in his Non-Competition, Non-Solicitation and Confidentiality Agreement.

94.     Defendant Sawyer also remains within the 36-month Restricted Period of the Non-Competition provision in his Profits Interests Unit Grant Agreement.

95.     In his new role at Westcoast, Defendant Sawyer uses Miner's confidential, proprietary, trade secret information to directly compete against Miner in furtherance of Westcoast's business purposes.

### *Miner's Efforts to Stem the Defendants' Illegal Conduct*

96.     When Miner became aware that Defendant Sawyer was working for Westcoast in violation of the Non-Compete and Confidentiality restrictive covenants in his Non-Competition, Non-Solicitation and Confidentiality Agreement and the Non-Competition restrictive covenant in his Profits Interests Unit Grant Agreement, Miner sent Defendant Sawyer a letter on April 15, 2022 demanding that he cease and desist from violating his restrictive covenants. *See* **Exhibit F**, April 15, 2022 Cease and Desist Letter to Defendant Sawyer.

97.     Additionally, Miner sent Defendant Flecken and Defendant Westcoast a letter on April 15, 2022 demanding that Defendant Flecken cease and desist from violating his restrictive covenants with Miner and that Defendant Westcoast cease its illicit conduct. *See* **Exhibit G,** April 15, 2022 Cease and Desist Letter to Defendant Flecken and Defendant Westcoast.

*Westcoast's Ongoing Interference with Miner's Operations*

98.     With the knowledge that Defendant Sawyer and Defendant Flecken are subject to contractual obligations with Miner, Defendant Westcoast is continues to employ Defendant Sawyer and Defendant Flecken as Chief Operating Officer and Chief Executive Officer of Westcoast, respectively.

99.     Through their employment with Westcoast, Defendant Sawyer and Defendant Flecken are misappropriating Miner's confidential, proprietary, trade secret information, including highly valuable "know how," including but not limited to financial information, trade secrets, pricing policies, pricing discounts, operational methods, marketing plans and/or strategies, product development techniques or plans, designs and design projects and other business affairs for their individual benefit and the benefit of Westcoast.

100.    Specifically, in their roles with Defendant Westcoast, Defendant Sawyer and Defendant Flecken oversee Westcoast's gate installation, gate automation, and gate repair focused business as two of its primary management executives who manage and oversee Westcoast's full-scale operation from beginning to end, including consultations with customers, on-site property reviews, drafting and formulating proposals and pricing strategies, preparing lists of materials and detailed project timelines, developing project costs and marketing strategies, assigning customer service representatives to manage the fabrication process and ultimately oversee the gate

installation and repair process from start to finish, all armed with the knowledge of Miner's proprietary, confidential and trade secret information regarding the same.

101.    Namely, Defendant Sawyer and Defendant Flecken have intimate knowledge of Miner's financial information, pricing policies, pricing discounts, operational methods, marketing plans, strategies, product development techniques, plans, designs and design projects all of which generate value well in excess of $75,000 to Miner by not being generally known to the public or competitors.

102.    Defendant Flecken and Defendant Sawyer are misappropriating Miner's proprietary, confidential and trade secret information to Miner's detriment to improperly compete directly against and undercut Miner in the highly competitive industry in which Miner and Defendant Westcoast operate.

103.    The Defendants have positioned themselves to unfairly compete against Miner and created an unfair competitive advantage through the use of Miner's proprietary, confidential and trade secret information.

### *The Present Action*

104.    This action was filed to stop Defendant Sawyer, Defendant Flecken and Defendant Westcoast's illegal actions in violation of state and federal law and to enforce Defendant Sawyer and Defendant Flecken's respective agreements with Miner.

105.    Miner seeks an Order requiring Defendants to return all Miner trade secrets and confidential information in their possession, custody, or control.

106.    Further, Miner seeks an order requiring Defendant Westcoast to cease using all of Miner's trade secrets, however obtained, including, but not limited to, through their employment

010-9359-5190/11

of Defendant Sawyer and/or Defendant Flecken.

107.    Miner further seeks an Order requiring Defendant Westcoast to cease its employment of Defendant Sawyer and Defendant Flecken as Defendant Sawyer is in violation of his Non-Compete and Confidentiality restrictive covenants in his Non-Competition, Non-Solicitation and Confidentiality Agreement and the Non-Competition restrictive covenant in his Profits Interests Unit Grant Agreement, and Defendant Flecken is in violation of the Non-Competition restrictive covenants in his Profits Interests Unit Grant Agreements.

108.    Miner is further entitled to an order from this Court permanently restraining Defendant Sawyer and Defendant Flecken from (1) soliciting Miner's employees; and (2) using Miner's confidential, and proprietary information, including its trade secrets, in competition with Miner's business for the duration of their respective Agreements' applicable Non-Competition Period and Restrictive Periods, including tolling.

109.    Defendant Sawyer and Defendant Flecken's Agreements' applicable Non-Competition and Restrictive Periods should be tolled so that they commence on the first day following the complete cessation of Defendants Sawyer and Flecken's respective breaches of their Agreements.

110.    Unless a preliminary injunction is issued, the threatened injury to Miner outweighs whatever damages the proposed order and injunction may cause the Defendants.

111.    Further, unless a preliminary injunction is issued, Miner will continue to suffer irreparable injury.

112.    There is substantial likelihood that Miner will prevail on the merits of the underlying claims and/or that this case presents serious issues on the merits which should be the

subject of further litigation.

113.    Based on the foregoing wrongful conduct by the Defendants—which was knowing, willful, intentional, reckless and/or grossly negligent—Miner is entitled to an award of specific performance, compensatory damages, punitive damages, attorney fees, and costs, and injunctive relief.

## COUNT I

### Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement: Breach of Non-Compete Restrictive Covenant (Defendant Sawyer)

114.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

115.    Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement is a valid and binding contract supported by good and valuable consideration. Specifically, Defendant Sawyer entered into the Non-Competition, Non-Solicitation and Confidentiality Agreement in connection with his acceptance of a promotion to the position of Regional Vice President, Miner Southwest and an accompanying increase in compensation.

116.    The Non-Compete provision of the Non-Competition, Non-Solicitation and Confidentiality Agreement is reasonably calculated to protect Miner's legitimate business interests, which include, but are not limited to, Miner's proprietary, confidential and trade secret information, and customer information and business goodwill.

117.    Pursuant to the Non-Competition, Non-Solicitation and Confidentiality Agreement, Defendant Sawyer is prohibited from working for a competing business for a period of three (3) years following the date of Defendant Sawyer's termination from Miner.

118.    Defendant Sawyer is in the Non-Competition Period defined in Non-Competition,

Non-Solicitation and Confidentiality Agreement as his employment with Miner terminated on February 3, 2022.

119.    Upon information and belief, Defendant Sawyer is working for Defendant Westcoast, a Miner competitor, as its Chief Operating Officer.

120.    Through his ongoing employment with Defendant Westcoast, Defendant Sawyer is in breach of the Non-Compete provision of the Non-Competition, Non-Solicitation and Confidentiality Agreement.

121.    Defendant Sawyer agreed in the Non-Competition, Non-Solicitation and Confidentiality Agreement that in the event of a breach, as is the case here, Miner will suffer irreparable damage and is entitled to injunctive relief

122.    As a direct and proximate result of Defendant Sawyer's breach of the Non-Compete provision of his Non-Competition, Non-Solicitation and Confidentiality Agreement, Miner has suffered and continues to suffer great and irreparable harm. The damages are considerable and continuing and thus not fully capable of ascertainment at this time. Miner has suffered damages in an amount to be determined at trial.

## COUNT II

**Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement:**
**Breach of Confidentiality Restrictive Covenant**
**(Defendant Sawyer)**

123.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

124.    Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality Agreement is a valid and binding contract supported by good and valuable consideration. Specifically, Defendant Sawyer entered into the Non-Competition, Non-Solicitation and

Confidentiality Agreement in connection with his acceptance of a promotion to the position of Regional Vice President, Miner Southwest and an accompanying increase in compensation.

125.    Pursuant to the Non-Competition, Non-Solicitation and Confidentiality Agreement, Defendant Sawyer, is required in perpetuity, to maintain in confidence all confidential, proprietary and trade secret information of Miner.

126.    The Confidentiality provision of the Non-Competition, Non-Solicitation and Confidentiality Agreement is reasonably calculated to protect Miner's legitimate business interests, which include, but are not limited to, Miner's proprietary, confidential and trade secret information, and customer information and business goodwill.

127.    Upon information and belief, Defendant Sawyer is working for Defendant Westcoast, a Miner competitor, as its Chief Operating Officer.

128.    Through his ongoing employment with Defendant Westcoast, Defendant Sawyer is in breach of the Confidentiality provision of the Non-Competition, Non-Solicitation and Confidentiality Agreement as he is using Miner's confidential, proprietary and trade secret information to improperly compete against Miner.

129.    Defendant Sawyer agreed in the Non-Competition, Non-Solicitation and Confidentiality Agreement that in the event of a breach, as is the case here, Miner will suffer irreparable damage and is entitled to injunctive relief.

130.    As a direct and proximate result of Defendant Sawyer's breach of the Confidentiality provision of his Non-Competition, Non-Solicitation and Confidentiality Agreement, Miner has suffered and continues to suffer great and irreparable harm. The damages are considerable and continuing and thus not fully capable of ascertainment at this time. Miner has

suffered damages in an amount to be determined at trial.

## COUNT III

**Defendant Sawyer's Profits Interests Unit Grant Agreement:
Breach of Non-Competition Restrictive Covenant
(Defendant Sawyer)**

131.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

132.    Defendant Sawyer's Profits Interests Unit Grant Agreement is a valid and binding contract supported by good and valuable consideration. Specifically, Defendant Sawyer entered into the Profits Interests Unit Grant Agreement in exchange for the right to participate in Miner's stock option ownership plan.

133.    The Non-Competition provision of the Profits Interests Unit Grant Agreement is reasonably calculated to protect Miner's legitimate business interests, which include, but are not limited to, Miner's proprietary, confidential and trade secret information, and customer information and business goodwill.

134.    Pursuant to Defendant Sawyer's Profits Interests Unit Grant Agreement, Defendant Sawyer is prohibited from working for a competing business for a period of thirty-six (36) months after Defendant Sawyer ceases to hold any Stock Units in Miner.

135.    Defendant Sawyer still holds Stock Units outlined in the Profits Interests Unit Grant Agreement, and thus is subject to the restrictive covenants contained in the Profits Interests Unit Grant Agreement.

136.    Upon information and belief, Defendant Sawyer is working for Defendant Westcoast, a Miner competitor, as its Chief Operating Officer.

137.    Defendant Sawyer's employment with Defendant Westcoast as its Chief Operating

Officer and his use of Miner's confidential and proprietary information in connection therewith, as outlined herein, breach the Non-Competition provision of his Profits Interests Unit Grant Agreement.

138.    As a direct and proximate result of Defendant Sawyer's breach of the Non-Competition provision of his Profits Interests Unit Grant Agreement, Miner has suffered and continues to suffer great and irreparable harm. The damages are considerable and continuing and thus not fully capable of ascertainment at this time. Miner has suffered damages in an amount to be determined at trial.

## COUNT IV

### Defendant Flecken's Profits Interests Unit Grant Agreements:
### Breach of Non-Competition Restrictive Covenants
### (Defendant Flecken)

139.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

140.    Defendant Flecken's Profits Interests Unit Grant Agreements are valid and binding contracts supported by good and valuable consideration. Specifically, Defendant Flecken entered into the Profits Interests Unit Grant Agreements in exchange for the right to participate in Miner's stock option ownership plan.

141.    Pursuant to the Profits Interests Unit Grant Agreements, Defendant Flecken is prohibited from working for a competing business, such as Defendant Westcoast, for a period of thirty-six (36) months after Defendant Flecken ceases to hold any Stock Units in Miner identified in the Agreements.

142.    The Non-Competition provision of the Profits Interest Unit Grant Agreements are reasonably calculated to protect Miner's legitimate business interests, which include, but are not

30

limited to, Miner's proprietary, confidential and trade secret information, and customer information and business goodwill.

143.    Upon information and belief, Defendant Flecken is currently working for Defendant Westcoast, a Miner competitor, as its Chief Executive Officer.

144.    Defendant Flecken still holds a certain capital investment subject to the terms of the Profits Interests Unit Grant Agreements, and thus is subject to the restrictive covenants contained in the Agreements.

145.    Defendant Flecken's employment with Defendant Westcoast as its Chief Executive Officer, as outlined herein, is in breach of the Non-Competition provisions of his Profits Interests Unit Grant Agreements.

146.    As a direct and proximate result of Flecken's breaches of the Non-Competition provisions of his Profits Interests Unit Grant Agreements, Miner has suffered and continues to suffer great and irreparable harm. The damages are considerable and continuing and thus not fully capable of ascertainment at this time. Miner has suffered damages in an amount to be determined at trial.

## COUNT V

**Defendant Flecken's Profits Interests Unit Grant Agreements:**
**Breach of Non-Solicitation Restrictive Covenants**
**(Defendant Flecken)**

147.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

148.    Defendant Flecken's Profits Interests Unit Grant Agreements are valid and binding contracts supported by good and valuable consideration. Specifically, Defendant Flecken entered into the Profits Interests Unit Grant Agreements in exchange for the right to participate in Miner's

stock option ownership plan.

149.    Pursuant to the Profits Interests Unit Grant Agreements, Defendant Flecken is prohibited from soliciting Miner employees, such as Defendant Sawyer, for a period of thirty-six (36) months after Defendant Flecken ceases to hold any Stock Units in Miner identified in the Agreements.

150.    Defendant Flecken still holds a certain capital investment subject to the terms of the Profits Interests Unit Grant Agreements, and thus is subject to the restrictive covenants contained in the Agreements.

151.    The Non-Solicitation provisions of the Profits Interest Unit Grant Agreements are reasonably calculated to protect Miner's legitimate business interests, which include, but are not limited to, Miner's proprietary, confidential and trade secret information, and customer information and business goodwill.

152.    Defendant Flecken improperly solicited, recruited, induced and hired Defendant Sawyer to join Defendant Westcoast as Defendant Westcoast's Chief Operating Officer.

153.    Defendant Flecken's solicitation, inducement and hiring of Defendant Flecken at Defendant Westcoast, as outlined herein, breach the Profits Interests Unit Grant Agreements.

154.    As a direct and proximate result of Flecken's breaches of the Non-Solicitation provisions of his Profits Interests Unit Grant Agreements, Miner has suffered and continues to suffer great and irreparable harm. The damages are considerable and continuing and thus not fully capable of ascertainment at this time. Miner has suffered damages in an amount to be determined at trial.

## COUNT VI

**Tortious Interference with Contract:**
**Interference with Defendant Sawyer's Profits Interests Unit Grant Agreement**
**(Defendant Flecken and Defendant Westcoast)**

155.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

156.    As set forth herein, Defendant Flecken solicited one of Miner's high-ranking employees, Defendant Sawyer, for employment with Westcoast.

157.    Defendant Flecken, on behalf of Defendant Westcoast, had contact with Defendant Sawyer while Defendant Sawyer was employed by Miner, with the intent to cause Defendant Sawyer to cease his employment with Miner and begin working for Defendant Westcoast.

158.    Defendant Flecken and Defendant Westcoast were aware that Defendant Sawyer is and remains subject to restrictive covenant agreements with Miner.

159.    As a result of Defendant Flecken and Defendant Westcoast's interference with Defendant Sawyer's Profits Interest Unit Grant Agreement with Miner, Miner has already been damaged and expects further damage.

160.    Defendant Sawyer's Profits Interests Unit Grant Agreement is a valid and binding contract supported by good and valuable consideration. Specifically, Defendant Sawyer entered into the Profits Interests Unit Grant Agreement in exchange for the right to participate in Miner's stock option ownership plan.

161.    The Profits Interest Unit Grant Agreement is reasonably calculated to protect Miner's legitimate business interests, which include, but are not limited to, Miner's proprietary, confidential and trade secret information, and customer information and business goodwill.

162.    Even after putting Defendant Westcoast on notice directly of Defendant Sawyer's

33

restrictive covenants not to compete against Miner as outlined in Defendant Sawyer's Profits Interest Unit Grant Agreement with Miner, Defendant Westcoast continues to employ Defendant Sawyer.

163.    Defendant Flecken and Defendant Westcoast's intentional and unlawful interference with the terms, namely the Non-Competition provision of Defendant Sawyer's Profits Interests Unit Grant Agreement with Miner and the other covenants contained therein has deprived Miner of the economic benefit of its contract with Defendant Sawyer.

164.    The wrongful conduct of Defendant Flecken and Defendant Westcoast was knowing, willful, intentional, malicious, reckless or grossly negligent.

165.    Miner has suffered and will continue to suffer immediate and irreparable harm as a result of the conduct of Defendant Flecken and Defendant Westcoast.

## COUNT VII

### Tortious Interference with Contract:
### Interference with Defendant Sawyer's Non-Competition, Non-Solicitation, and Confidentiality Agreement
### (Defendant Flecken and Defendant Westcoast)

166.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

167.    As set forth herein, Defendant Flecken solicited one of Miner's high-ranking employees, Defendant Sawyer, for employment with Westcoast.

168.    Defendant Flecken, on behalf of Defendant Westcoast, had contact with Defendant Sawyer while Defendant Sawyer was employed by Miner, with the intent to cause Defendant Sawyer to cease his employment with Miner and begin working for Defendant Westcoast.

169.    Defendant Flecken and Defendant Westcoast were aware that Defendant Sawyer is

34

and remains subject to restrictive covenant agreements with Miner.

170.    As a result of Defendant Flecken and Defendant Westcoast's interference with Defendant Sawyer's Non-Competition, Non-Solicitation, and Confidentiality Agreement with Miner, Miner has already been damaged and expects further damage.

171.    Defendant Sawyer's Non-Competition, Non-Solicitation, and Confidentiality Agreement is a valid and binding contract supported by good and valuable consideration. Specifically, Defendant Sawyer entered into the Non-Competition, Non-Solicitation and Confidentiality Agreement in connection with his acceptance of a promotion to the position of Regional Vice President, Miner Southwest and an accompanying increase in compensation.

172.    The Non-Competition, Non-Solicitation, and Confidentiality Agreement is reasonably calculated to protect Miner's legitimate business interests, which include, but are not limited to, Miner's proprietary, confidential and trade secret information, and customer information and business goodwill.

173.    Even after putting Defendant Westcoast on notice directly of Defendant Sawyer's restrictive covenants not to compete against Miner and not to disclose Miner's confidential information as outlined in Defendant Sawyer's Non-Competition, Non-Solicitation, and confidentiality Agreement with Miner, Defendant Westcoast continues to employ Defendant Sawyer.

174.    Defendant Flecken and Defendant Westcoast's intentional and unlawful interference with the terms, namely the Non-Competition and Confidentiality provisions of Defendant Sawyer's Non-Competition, Non-Solicitation, and Confidentiality Agreement with Miner and the other covenants contained therein has deprived Miner of the economic benefit of its

010-9359-5190/11

contract with Defendant Sawyer.

175.   The wrongful conduct of Defendant Flecken and Defendant Westcoast was knowing, willful, intentional, malicious, reckless or grossly negligent.

176.   Miner has suffered and will continue to suffer immediate and irreparable harm as a result of the conduct of Defendant Flecken and Defendant Westcoast.

## COUNT VIII

### Tortious Interference with Contract:
### Interference with Defendant Flecken's Profits Interests Unit Grant Agreements
### (Defendant Westcoast)

177.   Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

178.   As set forth herein, Defendant Westcoast hired Defendant Flecken, one of Miner's high-ranking former employees for employment with Defendant Westcoast.

179.   Defendant Westcoast was aware that Defendant Flecken is and remains subject to restrictive covenant agreements with Miner.

180.   Defendant Flecken's Profits Interests Unit Grant Agreements are valid and binding contracts supported by good and valuable consideration. Specifically, Defendant Flecken entered into the Profits Interests Unit Grant Agreements in exchange for the right to participate in Miner's stock option ownership plan.

181.   The Profits Interest Unit Grant Agreements are reasonably calculated to protect Miner's legitimate business interests, which include, but are not limited to, Miner's proprietary, confidential and trade secret information, and customer information and business goodwill.

182.   As a result of Defendant Westcoast's interference, Miner has already been damaged and expects further damage.

183.    Even after putting Defendant Westcoast on notice directly of Defendant Flecken's restrictive covenant agreements with Miner, Defendant Westcoast continues to employ Defendant Flecken.

184.    Defendant Westcoast's intentional and unlawful interference with Defendant Flecken's Profits Interests Unit Grant Agreements and the covenants contained therein has deprived Miner of the economic benefit of its contracts with Defendant Flecken.

185.    The wrongful conduct of Defendant Westcoast was knowing, willful, intentional, malicious, reckless or grossly negligent.

186.    Miner has suffered and will continue to suffer immediate and irreparable harm as a result of the conduct of Defendant Westcoast.

## COUNT IX

**Misappropriation of Trade Secrets: Federal Defend Trade Secrets Act
(Defendant Sawyer, Defendant Flecken and Defendant Westcoast)**

187.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

188.    During their employment with Miner, Defendant Sawyer and Defendant Flecken, each had access to and did access Miner's confidential, proprietary, trade secret information, including, but not limited to, customer lists and information, supplier lists and information, pricing information, product development information and other trade secret information that Miner deems private and proprietary in nature. This confidential and proprietary information constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3).

189.    Miner exerts substantial efforts to keep its business and financial information secret. Those steps include, but are not limited to, (1) requiring the execution of non-compete, non-

37

solicitation, and nondisclosure restrictive covenants; (2) instructing employees to avoid conflicts of interest; (3) marking many of Miner's most confidential documents with a "confidential" or similar legend; (4) conducting on-the-job security training and utilizing occupational security best practices; (5) implementing electronic security measures, such as use of passwords, security time-outs on computers, and segregation of confidential information; and (6) employing physical security measures, such as placing locks on offices, doors, and file cabinets.

190.    Miner derives economic value from such secrecy by depriving competitors like Defendant Westcoast of opportunities to use Miner's trade secrets to gain competitive advantage.

191.    Since terminating his employment with Miner, Defendant Sawyer, personally and through his employment with Defendant Westcoast, has misappropriated Miner's trade secrets within the meaning of 18 U.S.C. § 1839(5) by using the trade secrets in conjunction with his work at Westcoast.

192.    Specifically, Defendant Sawyer, in his role as Chief Operating Officer and while armed with Miner's trade secrets, oversees Defendant Westcoast's gate installation, gate automation and gate repair focused business beginning with consultations, to on-site property reviews, to drafting and formulating proposals and pricing strategies, to preparing lists of materials and detailed timelines for the clients, to developing project costs and marketing strategies, to assigning customer service representatives to manage the fabrication process and ultimately overseeing the gate installation and repair process from start to finish.

193.    Defendant Sawyer's misappropriation of Miner's trade secrets for the benefit of Defendant Westcoast entitles Plaintiff to immediate injunctive relief and damages, pursuant to 18 U.S.C. § 1836(b)(3).

194.    Since terminating his employment with Miner, Defendant Flecken, personally and through his employment with Defendant Westcoast, has misappropriated Miner's trade secrets within the meaning of 18 U.S.C. § 1839(5) by using the trade secrets in conjunction with his work at Westcoast.

195.    Further, Defendant Flecken and Defendant Westcoast have obtained trade secrets within the meaning of 18 U.S.C. § 1839(5) through their hire of Defendant Sawyer who has misappropriated Miner's trade secret information in conjunction with his work at Defendant Westcoast.

196.    Additionally, Defendant Flecken, in his role as Chief Executive Officer and while armed with Miner's trade secrets, oversees Defendant Westcoast's gate installation, gate automation and gate repair focused business beginning with consultations, to on-site property reviews, to drafting and formulating proposals and pricing strategies, to preparing lists of materials and detailed timelines for the clients, to developing project costs and marketing strategies, to assigning customer service representatives to manage the fabrication process and ultimately overseeing the gate installation and repair process from start to finish.

197.    Defendant Flecken's misappropriation of Miner's trade secrets for the benefit of Defendant Westcoast entitles Plaintiff to immediate injunctive relief and damages, pursuant to 18 U.S.C. § 1836(b)(3).

198.    At all material times, Defendant Sawyer, Defendant Flecken and Defendant Westcoast have acted willfully, maliciously, and in bad faith.

199.    As a result of Defendant Sawyer, Defendant Flecken and Defendant Westcoast's misappropriation, Plaintiff will suffer irreparable harm.

## COUNT X

### Misappropriation of Trade Secrets: Texas Uniform Trade Secrets Act
### Tex. Civ. Prac. & Rem. Code § 134A.001 *et. seq.*
### (Defendant Sawyer, Defendant Flecken and Defendant Westcoast)

200.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

201.    During their employment with Miner, Defendant Sawyer and Defendant Flecken each had access to and did access Miner's confidential and proprietary information, including but not limited to its customer lists and information, supplier lists and information, pricing information, product development information and other trade secret information that Miner deems private and proprietary in nature. This confidential and proprietary information constitutes trade secrets within the meaning of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. § 134A.002(6).

202.    During his employment with Miner, Defendant Sawyer had access to and did access Miner's confidential and proprietary information, including, customer lists and information, supplier lists and information, pricing information, product development information and other trade secret information that Miner deems private and proprietary in nature. This confidential and proprietary information constitutes trade secrets with the meaning of Tex. Civ. Prac. & Rem. § 134A.002(6).

203.    During his employment with Miner, Defendant Flecken had access to and did access Miner's confidential and proprietary information, including, but not limited to, customer lists and information, supplier lists and information, pricing information, product development information and other trade secret information that Miner deems private and proprietary in nature. This confidential and proprietary information constitutes trade secrets with the meaning of Tex.

40

Civ. Prac. & Rem. § 134A.002(6).

204. Further, Defendant Flecken and Defendant Westcoast obtained trade secrets within the meaning of 18 U.S.C. § 1839(5) through their hire of Defendant Sawyer and from Defendant Sawyer directly misappropriating Miner's trade secrets with the meaning of Tex. Civ. Prac. & Rem. § 134A.002(6).

205. Defendant Sawyer, Defendant Flecken and Defendant Westcoast benefited from and have used Miner's confidential and proprietary information, including, but not limited to customer lists and information, supplier lists and information, pricing information and product development information. At all times, Defendant Sawyer, Defendant Flecken and Defendant Westcoast understood these items were Miner's confidential and proprietary information.

206. Miner exerts substantial efforts to keep its customer lists and information, supplier lists and information, pricing information and product development information secret.

207. Miner derives economic value from such secrecy by depriving competitors like Defendant Westcoast of opportunities to use Miner's trade secrets to gain a competitive advantage.

208. Since leaving Miner, however, Defendant Sawyer and Defendant Flecken have misappropriated Miner's trade secrets within the meaning of Tex. Civ. Prac. & Rem. § 134A.002(3) and used them in conjunction with their work at Defendant Westcoast.

209. Defendant Sawyer and Defendant Flecken's misappropriation of Miner's trade secrets entitles Miner to immediate injunctive relief and damages, pursuant to Tex. Civ. Prac. & Rem. § 134A.003(c).

210. At all material times, Defendant Sawyer, Defendant Flecken and Defendant Westcoast have acted willfully, maliciously, and in bad faith.

41

211.    Miner contacted Defendant Flecken, Defendant Westcoast and Defendant Sawyer seeking to have them cease and desist their illegal conduct, but they refused. *See* **Exhibit F,** Cease & Desist Ltr. to Sawyer and **Exhibit G**, Cease & Desist Ltr. to Flecken and Westcoast

212.    As a result of Defendant Sawyer, Defendant Flecken and Defendant Westcoast's misappropriation, Miner will suffer irreparable harm.

## COUNT XI

### Breach of Fiduciary Duty and Duty of Loyalty
### (Defendant Sawyer and Defendant Flecken)

213.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

214.    As a Senior Vice President of Operations and Customer Care, Defendant Sawyer owed a fiduciary duty to both Miner and its subsidiaries.

215.    As a Regional Vice President, Defendant Flecken owed a fiduciary duty to both Miner and its subsidiaries.

216.    Further, as Owners of Miner Stock Units, Defendants Sawyer and Defendant Flecken maintain a duty to not engage in activities which conflict with their obligations to Miner, and to maintain Miner's confidential, proprietary information with the utmost confidence.

217.    In connection with his fiduciary duties, Defendant Sawyer owed Miner a duty to avoid acting contrary to Miner's interests and to not use Miner's confidential, proprietary and trade secret information to compete against Miner, including but not limited to financial information, trade secrets, pricing policies, pricing discounts, operational methods, marketing plans and/or strategies, product development techniques or plans, designs and design projects.

218.    In connection with his fiduciary duties, Defendant Flecken owed Miner a duty to

42

avoid acting contrary to Miner's interests, not to solicit Miner's employees (Defendant Sawyer), and to not use Miner's confidential, proprietary and trade secret information to compete against Miner, including but not limited to financial information, trade secrets, pricing policies, pricing discounts, operational methods, marketing plans and/or strategies, product development techniques or plans, designs and design projects.

219.   Defendant Sawyer owed Miner a duty not to divulge, disclose, expose, or misuse Miner's proprietary information.

220.   Defendant Flecken owed Miner a duty not to divulge, disclose, expose, or misuse Miner's proprietary information.

221.   Nonetheless, Defendant Sawyer breached his fiduciary duties to Miner by misappropriating Miner's proprietary information including trade secrets on behalf of Defendant Westcoast.

222.   Defendant Flecken breached his fiduciary duties to Miner by soliciting and hiring Miner's high-level executive (Defendant Sawyer) and misappropriating Miner's proprietary information including trade secrets on behalf of Defendant Westcoast.

223.   As a direct and proximate result of Defendant Sawyer's willful breach of his fiduciary duties and duty of loyalty to Miner, Miner has suffered and will continue to suffer damages in the form of lost business, lost revenue, lost goodwill, and other immeasurable and irreparable injuries.

224.   As a direct and proximate result of Defendant Flecken's willful breach of his fiduciary duties and duty of loyalty to Miner, Miner has suffered and will continue to suffer damages in the form of lost business, lost revenue, lost goodwill, and other immeasurable and

43

irreparable injuries.

## COUNT XII

### Unfair Competition
### (Defendant Sawyer, Defendant Flecken and Defendant Westcoast)

225.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

226.    Miner's confidential, proprietary and trade secret information, as identified herein, was created by Miner through extensive time, labor, skill and money.

227.    The Defendants' conduct and the wrongful use and acquisition of Miner's confidential, proprietary and trade secret information, as described herein, is giving the Defendants a special advantage and a free ride because the Defendants are burdened with little or none of the expense incurred by Miner in developing its confidential, proprietary and trade secret information.

228.    As a result of Defendants' unfair competition, Miner has suffered substantial commercial damage and harm for which it is entitled to collect damages, including punitive damages.

229.    Defendants' conduct was intentional, willful, and outrageous, and was undertaken with indifference to the rights of Miner.

230.    In addition, the Company has suffered and will continue to suffer harm—including the loss of employees, loss of customers, loss of potential customers, loss of goodwill, and the unauthorized disclosure of its confidential, proprietary and confidential trade secret information for which Miner is entitled to preliminary and permanent injunctive relief.

44

## COUNT XIII

**Conspiracy to Tortiously Interfere with Defendant Sawyer's Agreements with Miner
(Defendant Flecken and Defendant Westcoast)**

231.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

232.    Defendant Flecken and Defendant Westcoast conspired to induce Defendant Sawyer to breach his restrictive covenants agreements with Miner.

233.    To achieve the objective of their conspiracy, Defendant Flecken and Defendant Westcoast engaged in several overt acts, as described herein, including but not limited to the ongoing interference with Defendant Sawyer's contractual agreements with Miner by soliciting, inducing and hiring Defendant Sawyer to work for Defendant Westcoast and continuing to employ Defendant Sawyer all while knowing that he remains subject to restrictive covenants with Miner.

234.    The aforementioned acts by the Defendants have damaged Miner, and if not enjoined will continue to damage Miner and cause it irreparable harm for which Miner has no adequate remedy at law.

## COUNT XIV

**Conspiracy to Misappropriate Miner's Trade Secrets
(Defendant Sawyer, Defendant Flecken and Defendant Westcoast)**

235.    Miner incorporates Paragraphs 1 through 113 as if fully stated herein.

236.    Defendant Sawyer, Defendant Flecken and Defendant Westcoast conspired to misappropriate and disseminate Miner's confidential, proprietary and trade secret information.

237.    To achieve the objective of their conspiracy, Defendant Sawyer, Defendant Flecken and Defendant Westcoast engaged in several overt acts, as described herein, including but not limited to the ongoing employment of Defendant Sawyer and Defendant Flecken at Defendant

45

Westcoast, and utilizing Miner's valuable confidential and proprietary information "know how,"
including but not limited to financial information, trade secrets, pricing policies, pricing discounts,
operational methods, marketing plans and/or strategies, product development techniques or plans,
designs and design projects obtained through Defendant Sawyer and Defendant Flecken to directly
compete with Miner.

238.    The aforementioned acts by the Defendants have damaged Miner, and if not
enjoined will continue to damage Miner and cause it irreparable harm for which Miner has no
adequate remedy at law.

### **PRAYER FOR RELIEF**

WHEREFORE, Miner has a substantial likelihood of success on the merits of its claims
and injunctive relief would serve the public interest, Miner respectfully requests that the Court
enter judgment against Defendant Tom Sawyer, Defendant Bob Flecken and Defendant
Westcoast Gate & Entry Systems, LLC (collectively, the "Defendants"):

1.    Enjoining Defendant Sawyer from breaching his Non-Competition, Non-
Solicitation and Confidentiality Agreement and his Profits Interests Unit Grant Agreement with
Miner and his fiduciary duties and duty of loyalty to Miner, and misappropriating Miner's trade
secrets;

2.    Enjoining Defendant Flecken from breaching his Profits Interests Unit Grant
Agreements with Miner and his fiduciary duties and duty of loyalty to Miner, and misappropriating
Miner's trade secrets;

3.    Awarding Miner a temporary and permanent injunction to enforce the restrictive
covenants in Defendant Sawyer's Non-Competition, Non-Solicitation and Confidentiality

Agreement and Profits Interests Unit Grant Agreement, including equitably tolling the provisions therein for the period of Defendant Sawyer's violations;

4.      Awarding Miner a temporary and permanent injunction to enforce the restrictive covenants in Defendant Flecken's Profits Interests Unit Grant Agreements, including equitably tolling the provisions therein for the period of Defendant Flecken's violations;

5.      Requiring Defendant Sawyer, Defendant Flecken and Defendant Westgate to return to Plaintiff any and all of Miner's trade secrets in their custody and control;

6.      Enjoining Defendant Flecken, Defendant Sawyer, and Defendant Westgate from unfairly competing against Miner;

7.      Awarding Miner all damages from the violations outlined above;

8.      Awarding Miner its attorneys' fees and costs; and

9.      Awarding Miner all other relief to which it may be justly entitled.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted this 24th day of May, 2022.

**SQUIRE PATTON BOGGS (US) LLP**

*/s/ Alex J. Pennetti*
Alex J. Pennetti
SBN: 24110208
Alex.pennetti@squirepb.co
2000 McKinney Ave, Suite 1600
Dallas, Texas 75201

David W. Long-Daniels*
Georgia Bar No. 141916
david.long-daniels@squirepb.com
One Atlantic Center

47

1201 W. Peachtree Street, NW
Suite 3150
Atlanta, Georgia 30309

*Motion for Admission Pro Hac Vice forthcoming*

**Attorneys for Plaintiff Miner, Ltd.**

48

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **MINER, LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **THOMAS SAWYER, BOB FLECKEN** | § | **JURY TRIAL DEMANDED** |
| **and WESTCOAST GATE & ENTRY** | § | |
| **SYSTEMS, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

## VERIFICATION

John Osgood, being of full age, hereby certifies as follows:

I am authorized on behalf of Plaintiff Miner, Ltd. ("Miner") to make this verification. The facts stated in the foregoing Plaintiff Miner, Ltd.'s Complaint for Injunctive Relief and Damages and Demand for Jury Trial are true and correct to the best of my knowledge. This verification is based on my personal knowledge, as well as knowledge and information provided to and obtained by me in in my capacity as Vice President, Field Human Resources for Miner.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 23, 2022.

_____
John Osgood
Vice President, Field Human Resources